2006-NMSC-032

139 P.3d 166

**DOÑA ANA MUTUAL DOMESTIC WATER CONSUMERS ASSO-CIATION, Appellant,**

v.

**NEW MEXICO PUBLIC REGULATION COMMISSION, and Moongate Water Co., Inc., Appellees.**

No. 29,242.

Supreme Court of New Mexico.

June 20, 2006.

Hubert & Hernandez P.A., Rachel A. Brown, Las Cruces, NM, for Appellant.

Lee W. Huffman, Santa Fe, NM, Kyle W. Gesswein, Las Cruces, NM, Cuddy, Kennedy, Hetherington, Albetta & Ives, Patricia Salazar Ives, Santa Fe, NM, for Appellees.

**OPINION**

MINZNER, Justice.

{1} This is a direct appeal under NMSA 1978, Section 62–11–1 (1993), from a Final Order of the New Mexico Public Regulatory Commission (PRC) determining that Moongate Water Company, Inc. (Moongate) has the exclusive right to provide water service in an area east of Interstate 25 (I–25) and north of Las Cruces, and that Doña Ana Mutual Domestic Water Consumers Association (Doña Ana) may not pursue construction

of two water storage tanks and connecting lines it had planned for this area. On appeal, Doña Ana argues that: (1) the PRC used an improper standard to determine the scope of Moongate's protection under NMSA 1978, Section 62–9–1 (2000, prior to 2005 amendment); (2) the PRC's finding that Doña Ana's service within the disputed area would result in unreasonable interference with Moongate's service or system is not supported by substantial evidence; (3) the PRC erred in determining that Moongate had an exclusive right to serve Sandhill Center; (4) the PRC lacked jurisdiction to issue a general statement regarding the future right of Doña Ana to serve customers in the disputed area; and (5) the PRC did not have the power to prevent or condition Doña Ana's planned construction. We conclude that the PRC employed a reasonable standard when determining what constituted interference with a service or system, the order was supported by substantial evidence, and that the PRC acted within the scope of its authority and jurisdiction. We therefore affirm.

## I.  Background

{2} Doña Ana was created in 1974 to serve the area around the Village of Doña Ana, west of I–25, pursuant to the Sanitary Projects Act, NMSA 1978, Sections 3–29–1 through 3–29–20 (2004). As of March 2005, Doña Ana served approximately 3,133 connections. Doña Ana's eastern boundary has historically been I–25. With the exception of an RV storage unit, a hydrant for bulk sales, and two storage tanks just east of I–25, its facilities are all located west of I–25.

{3} Moongate is a regulated public utility, serving approximately 3,660 customers as of March 2005. Moongate West, a portion of the Moongate system, serves approximately 900 customers in the disputed area just east of I–25. With the exception of the RV storage unit and the hydrant owned by Doña Ana, Moongate West is the only water provider in the disputed area. Moongate West has been providing service, with the approval of the PRC, since 1985.

{4} In 2002, Doña Ana made plans to construct a well, a million gallon water storage tank, and transmission and distribution lines east of I–25 (the East Mesa Project) in an area Moongate claims is part of its service area. Doña Ana has indicated that the new tank is needed to serve its current customers west of I–25. The higher elevation of the East Mesa would allow Doña Ana to improve service to its customers by reducing the need for mechanical pressure in its systems. Doña Ana obtained state and federal funding for the project, estimated to cost $2.8 million. The tank will also have excess capacity that could be used to serve approximately 450 new customers in the disputed area east of I–25. Doña Ana has no plans to serve Moongate's current customers, but does plan to offer service to new customers in the disputed area.

{5} On June 20, 2003, Moongate filed a complaint pursuant to Section 62–9–1, seeking to prevent Doña Ana from constructing the East Mesa Project and alleging that the construction would unreasonably interfere with Moongate's service or system. Following an evidentiary hearing, the Hearing Examiner issued a Recommended Decision including proposed findings and a recommendation that: (1) Moongate should be given protection under Section 62–9–1 for three of the subdivisions in the disputed area; (2) either Doña Ana or Moongate could provide service to Sandhill Center; and (3) Doña Ana should be allowed to proceed with the East Mesa Project so long as Doña Ana did not offer service in the disputed area. Doña Ana, Moongate, and the Utility Division Staff of the PRC all filed written exceptions to the Recommended Decision.

{6} After considering the record and the exceptions filed, the PRC issued its final order adopting the majority of the Hearing Examiner's findings and recommendations, including that Doña Ana had no right to serve the disputed area, but also concluding that Doña Ana may not serve Sandhill Center and may not construct the East Mesa Project. The Order further stated that Doña Ana may resubmit a petition to allow construction of the East Mesa Project for the benefit of customers west of I–25, if Doña Ana first obtains approval of a binding service area agreement from the appropriate

federal authorities. Doña Ana appealed. On appeal, Doña Ana argues that: (1) the PRC used an improper standard to determine the scope of Moongate's protection under NMSA 1978, Section 62-9-1 (2000, prior to 2005 amendment); (2) the PRC's finding that Doña Ana's service within the disputed area would result in unreasonable interference with Moongate's service or system is not supported by substantial evidence; (3) the PRC erred in determining that Moongate had an exclusive right to serve Sandhill Center; (4) the PRC lacked jurisdiction to issue a general statement regarding the future right of Doña Ana to serve customers in the disputed area; and (5) the PRC did not have the power to prevent or condition Doña Ana's planned construction. We have jurisdiction under Section 62-11-1 and Rule 12-101(A) NMRA 2006.

## II. Discussion

{7} We begin by considering the appropriate standard of review. Doña Ana argues that we should review the agency's decision de novo because the PRC's jurisdiction over Doña Ana is limited by the terms of Section 62-9-1. Moongate argues that the only question presented is whether the order is supported by substantial evidence, is not arbitrary or capricious, and is within the scope of the PRC's jurisdiction. This Court has previously considered the "appropriate standard of review that should be applied when a court reviews an agency's determination of its own jurisdiction." *Morningstar Water Users Ass'n v. N.M. Pub. Util. Comm'n*, 120 N.M. 579, 582, 904 P.2d 28, 31 (1995). "[W]hether an administrative agency has jurisdiction over the parties or subject matter in a given case is a question of law.... [T]he agency's authority and jurisdiction are defined by statute." *Id.* at 583, 904 P.2d at 32 (citations omitted). We therefore accord little deference to an agency interpreting its own jurisdiction. *Id.*

{8} In this case, however, we do not view Doña Ana's claims as challenging the jurisdiction of the PRC. Doña Ana is not arguing that the PRC lacks jurisdiction over the parties. *Cf. id.* at 587-88, 904 P.2d at 36-37. Rather, Doña Ana notes that the PRC's jurisdiction is limited to those cases where construction of facilities "unreasonably interferes or is about to unreasonably interfere with the service or system" of another water utility or mutual domestic water consumer association (MDWCA). *See* § 62-9-1(A). Doña Ana argues that its East Mesa project will not unreasonably interfere with Moongate's service or system and argues that the PRC therefore lacked authority to prevent construction of the project. This challenge is directed at the correctness of the PRC's determination rather than the PRC's authority to address the issue or power to force the parties to comply with its orders. We therefore review this matter as an agency determination, one that involves determining the Legislature's intent in enacting Section 62-9-1, as well as whether necessary findings are supported by substantial evidence, and whether the conclusions the PRC reached were arbitrary, capricious, or otherwise contrary to law.[1]

{9} Doña Ana bears the burden on appeal of showing that the PRC's decision is arbitrary and capricious, not supported by substantial evidence, outside the scope of the agency's authority, or otherwise inconsistent with law. *Rio Grande Chapter of the Sierra Club v. N.M. Mining Comm'n*, 2003-NMSC-005, ¶ 17, 133 N.M. 97, 61 P.3d 806; *Morningstar*, 120 N.M. at 582, 904 P.2d at 31. We consider whether the decision presents a question of law, a question of fact, or some combination of the two, applying a distinct standard to questions of law and questions of fact. *Morningstar*, 120 N.M. at 582-83, 904 P.2d at 31-32.

{10} "[I]t is the function of the courts to interpret the law," and we are therefore not "bound by [an] agency's interpretation (of law) and may substitute (our) own judgment for" that of the agency. *Id.* at 583, 904 P.2d at 32. We are, however, more

1. Moongate has argued that Doña Ana is a public utility because it is engaged in business beyond the scope of its original authorization and notes that the PRC has the jurisdiction to regulate all public utilities. Because we conclude that the PRC had jurisdiction over Doña Ana as a mutual domestic water consumer association, we do not address this argument.

likely to defer to an agency interpretation if the relevant statute is unclear or ambiguous, *Rio Grande Chapter of the Sierra Club v. N.M. Mining Comm'n,* 2001–NMCA–047, ¶ 17, 130 N.M. 497, 27 P.3d 984; *see also Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the legal questions presented " 'implicate special agency expertise or the determination of fundamental policies within the scope of the agency's statutory function,' " *Morningstar,* 120 N.M. at 583, 904 P.2d at 32 (quoting *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.,* 746 P.2d 896, 903 (Alaska 1987)), and it appears that the agency has been delegated policy-making authority in the area. *Pub. Serv. Co. of N.M. v. N.M. Pub. Serv. Comm'n,* 112 N.M. 379, 382–83, 815 P.2d 1169, 1172–73 (1991).

> However, we long have recognized the power of agencies to interpret and construe the statutes that are placed, by legislative mandate, within their province. In other words, by delegating [a specific] power to the Commission in such broad terms, our legislature expected that the Commission would develop an appropriate test to fit the regulatory climate.

*Id.* (citations omitted). This deference is not absolute, however, and we will reject an agency's interpretation even of an ambiguous statute if it appears unreasonable or inconsistent with legislative intent. *See Chevron,* 467 U.S. at 843, 104 S.Ct. 2778.

{11} When reviewing a question of fact, we defer to the decision of an agency if it is supported by substantial evidence. *Morningstar,* 120 N.M. at 583, 904 P.2d at 32. We review the whole record to determine if the agency's factual determination is supported by substantial evidence, *id.,* which is "evidence that a reasonable mind would regard as adequate to support a conclusion." *Regents of Univ. of N.M. v. N.M. Fed'n of Teachers,* 125 N.M. 401, 407, 962 P.2d 1236, 1242 (1998). "We will not, however, substitute our judgment for that of the agency; although the evidence may support inconsistent findings, we will not disturb the agency's finding if supported by substantial evidence on the record as a whole." *Herman v. Min-*

ers' *Hosp.,* 111 N.M. 550, 552, 807 P.2d 734, 736 (1991); *see also Duke City Lumber Co. v. N.M. Envtl. Improvement Bd.,* 101 N.M. 291, 294, 681 P.2d 717, 720 (1984).

{12} We begin our review of the PRC's order by considering Doña Ana's contention that the PRC used an inappropriately broad standard in determining whether the construction Doña Ana planned would interfere with Moongate's service or system. After considering whether the PRC adopted a permissible definition of "unreasonably interfere with a service or system," we consider in turn whether the PRC's challenged findings regarding service in the disputed area were supported by substantial evidence. We then consider Doña Ana's contention that the PRC did not have the jurisdiction to issue a general statement regarding the future right of Doña Ana to serve customers in the disputed area. Finally, we address the PRC's authority to prohibit construction of the East Mesa Project for the benefit of Doña Ana's current customers.

### A. Definition of Interfere with a Service or System

{13} In their submissions before the PRC, both parties offered considerable testimony regarding Moongate's current capacity and ability to expand service to new customers. Although there is some disagreement regarding the precise capacity, the parties appear to agree that Moongate has some excess capacity, but will have to build additional facilities to accommodate the needs of the new customers currently seeking service in the disputed area. Doña Ana argues, in light of these facts, that there is no substantial evidence in the record that Moongate will have the capacity to serve future customers, and that the PRC therefore erred in finding that Doña Ana's service to those customers would result in unreasonable interference with Moongate's service or system. Resolution of this dispute depends on how the phrase "unreasonably interfere with a service or system" is interpreted.

{14} The PRC appears to have adopted an interpretation presuming that all contiguous territory lies within a utility's "service or system," and to have adopted a definition of

"contiguous" that includes territory within one-half mile of a public utility's pipes or facilities. In support of this interpretation, the PRC notes that public utilities have a duty to offer service in their service area, and that utilities are permitted by statute to construct line extensions into contiguous territory without seeking approval from the PRC. Doña Ana offers three alternate interpretations of this language, and suggests that the interpretation adopted by the PRC is overly expansive. Doña Ana argues that "service or system" should be defined as encompassing either: (1) only a utility's existing customers and facilities; (2) a utility's existing customers and facilities and all customers who could be served without additional improvements; or (3) all customers who could be served at a reasonable cost in a reasonable time by the utility with additional improvements.

█ {15} We first observe that the phrase "unreasonably interfere with the service or system" of a utility, while not wholly mysterious, does not lend itself well to judicial construction. Neither "interfere" nor "service or system" are defined by statute, and both are general enough terms to have a variety of meanings.[2] Doña Ana's own brief demonstrates this ambiguity by recognizing at least three possible meanings, all inconsistent to some degree with the interpretation adopted by the PRC.

{16} Next, we note that the PRC has been granted policy-making authority in several areas. See NMSA 1978, §§ 62–6–4 through 62–6–26.1 (2005) (establishing the PRC and setting out rate-making powers, associated duties, and procedures). Section 62–9–1 grants the PRC the additional authority to resolve service area disputes between utilities and MDWCA's.

If any public utility or mutual domestic water consumer association in constructing or extending its line, plant or system unreasonably interferes or is about to unreasonably interfere with the service or system of any other public utility or mutual domestic water consumer association rendering the same type of service, the commission ... may ... make an order and prescribe just and reasonable terms and conditions in harmony with the Public Utility Act [62–13–1 NMSA 1978] to provide for the construction, development and extension, without unnecessary duplication and economic waste.

Section 62–9–1(A). The statute explicitly instructs the PRC to minimize duplication and economic waste through its regulations, and permits the PRC to "prescribe just and reasonable terms" to achieve that end. We have previously recognized that public utilities are regulated monopolies, pledging to serve the public without discrimination and exchanging "the right to determine ... whom it will serve, what it will charge, or how it will finance or invest" for "relative freedom from competition." Morningstar, 120 N.M. at 590, 904 P.2d at 39 (quoting Dickinson v. Maine Pub. Serv. Co., 223 A.2d 435, 438 (Me.1966)); see also NMSA 1978, § 62–3–1(B) (1967). The PRC is the entity given the responsibility for setting rates, regulating these utilities, and limiting competition in order to prevent duplication and waste. See §§ 62–6–4 through 62–6–26.1; § 62–9–1. In addition to the specific procedures set out by the Legislature, the PRC has been provided with a general policy goal to guide its decision-making.

It is the declared policy of the state that the public interest, the interest of consumers and the interest of investors require the regulation and supervision of such public utilities to the end that reasonable and proper services shall be available at fair, just and reasonable rates, and to the end that capital and investment may be encouraged and attracted so as to provide for the construction, development and extension, without unnecessary duplication and economic waste, of proper plants and facilities

2. Although the phrase "service or system" is not defined, the term "service" is defined in NMSA 1978, Section 62–3–3(J) (2005) as "every rule, regulation, practice, act or requirement relating to the service or facility of a utility." This broad definition suggests that the phrase "service or system" should be read similarly expansively. We do not rest our analysis on this definition, however, because it does not shed much light on the question presented: whether future customers should be considered part of a utility's "service or system."

for the rendition of service to the general public and to industry.

Section 62–3–1(B). Thus, Section 62–9–1 is part of a comprehensive regulatory scheme granting the PRC the policy-making authority to plan and coordinate the activities of New Mexico public utilities, in a manner consistent with the Legislature's stated goals.

{17} We conclude, based on these statutes, that the Legislature intended to delegate relatively broad policy-making authority to the PRC. Section 62–9–1 instructs the PRC to avoid duplication and economic waste and appears to assign the PRC the role of coordinating and planning expansion of water service in the state. We further observe that the PRC requires flexibility in carrying out this mandate. A detailed understanding of the operation of public utilities is required to determine intelligently whether a particular activity will interfere with the service or system of a public utility. As the agency responsible for the regulation of public utilities, or as its successor, the PRC has developed this expertise. Our deference to an agency is at its height when, as here, we are presented with an ambiguous statute, administered by an agency which has been granted relevant policy-making authority, and implicating the expertise of the agency. Our deference is not absolute, however, and we will nonetheless reject an agency's interpretation of an ambiguous statute if it appears unreasonable or inconsistent with legislative intent.

{18} The PRC argues that its view of what may "unreasonably interfere with the service or system" of another service provider, including most activity within half a mile of a utility's existing facilities, is consistent with its statutory mandate to prevent duplication and economic waste. It appears reasonable, given its planning and coordination function, that the PRC include not only a public utility's physical plant and current customers in a "service or system," but also any contiguous territory that is not receiving similar service from another utility. Section 62–9–1(A) states that a utility need not secure a certificate "for an extension into territory contiguous to that already occupied by it and that is not receiving similar service from another

utility," and both Moongate and the PRC note that a utility has a duty to offer service to customers in its service area. *See* NMSA 1978, § 62–8–2 (1941); *Morningstar*, 120 N.M. at 590, 904 P.2d at 39 (public utilities accept the duty to offer service and submit to other regulations in exchange for protection from competition). For planning purposes, the PRC may, therefore, include this contiguous territory in the "service or system" of the utility. The agency's definition of contiguous, which includes territory within one-half mile of a utility's pipes or facilities, appears neither arbitrary nor capricious because utilities have both a right and a duty to extend service to these areas.

{19} Section 62–9–1 is somewhat ambiguous, and its interpretation requires both the PRC's technical expertise and its policy-making authority. We believe the Legislature intended the PRC to have broad discretion to regulate competing utilities and water providers in order to coordinate their activities and limit duplication and waste. The PRC's interpretation of interference with a service or system, which includes most encroachment by a utility or MDWCA within one-half mile of another utility's facilities, is consistent with the goals and purpose of Section 62–9–1. We conclude that it was properly adopted in this case.

{20} We therefore conclude the PRC employed a reasonable standard when determining whether Doña Ana's planned construction would interfere unreasonably with Moongate's service or system. We next consider whether there is substantial evidence to support the PRC's conclusion that Doña Ana's service to new customers within the disputed area would result in unreasonable interference with Moongate's service or system.

### B. Service to customers in disputed area

{21} Doña Ana argues that the record does not contain substantial evidence showing that its service to new customers in the disputed area would interfere with Moongate's service or system. After reviewing the testimony of both parties, the Hearing Examiner concluded that Moongate and its

current customers would be harmed if Doña Ana were to serve new customers in the area. Moongate would lose the ability to spread fixed costs over a larger customer base and the benefits of modernization, lose developer contributions to the construction of reserve capacity, lose the flexibility provided by multiple tanks and wells, and experience new problems with maintenance and repairs that are inherent to overlapping lines with other utilities. In support of these conclusions, Moongate offered testimony from its Vice President, Jeff Gariano, regarding the utility's planning and operations process, and the potential impact of Doña Ana's service in the area to Moongate and its customers. Gariano explained that Moongate's development plans were based on the assumption that they would be the only water service provider in the area and that Moongate's current facilities included excess capacity designed to accommodate expansion over time. If Doña Ana were permitted to serve the same area, this excess capacity would be "stranded." Gariano testified that Moongate had previously experienced maintenance problems where portions of their system overlapped with another water provider's systems. He anticipated similar problems arising from Doña Ana's construction because there would be over three miles of duplication in the water lines of the two systems. Moongate also offered the testimony of Dr. Thomas McGuckin, an economist at New Mexico State University in Las Cruces. Dr. McGuckin testified that certain economies of scale could only be achieved if all of the customers in the area were served by a single provider.

{22} Doña Ana argues that Moongate's testimony is self-serving and general, and should therefore not be considered substantial evidence. Because Moongate has a stated policy of constructing new facilities only to meet the needs of new customers, Doña Ana argues that there is no excess capacity in the system and no other benefits for existing customers. Doña Ana's service to new customers therefore cannot interfere with Moongate's system because it is only limiting Moongate's expansion, not interfering with its current system. Doña Ana also calls our attention to Dr. McGuckin's admission that

he had not specifically determined whether additional customers would benefit Moongate's system.

{23} "[A]lthough the evidence may support inconsistent findings, we will not disturb the agency's finding if supported by substantial evidence on the record as a whole." *See Herman*, 111 N.M. at 552, 807 P.2d at 736. The testimony submitted by Moongate was detailed enough to permit a reasonable person to conclude that Doña Ana's planned service to future customers in the disputed area would interfere with Moongate's system. Moongate's evidence supports the conclusion that Doña Ana's service would interfere with Moongate's physical system, its planning to provide future service, and its ability to realize economies of scale for its customers. We have found no indication in the record that Moongate's evidence was so devoid of factual basis or support, that it should not be viewed as substantial evidence. The PRC could consider the basic principle of economies of scale when making its decision. Those principles are specially relevant because the PRC is instructed to avoid economic waste. The admission that some of Dr. McGuckin's testimony was based on general principles, rather than a specific examination of Moongate's current system, does not undermine this testimony, which suggests that service can be most efficiently provided if a single provider is operating in the area, driving down per person costs over time. Further, Moongate did submit evidence that it built excess capacity into its existing lines in anticipation of future expansion. Having already determined that the PRC's definition of "service or system" including future expansion within one-half mile is reasonable, we conclude that evidence that encroachment on Moongate's service area will interfere with Moongate's planned expansion of service is substantial evidence of interference. Thus, the PRC's decision was supported by substantial evidence.

{24} Doña Ana also argues that the PRC is estopped from limiting its rights to serve the disputed area because Doña Ana has obtained water rights to be used for that purpose. We are not persuaded. The Office of the State Engineer did not have the juris-

diction to determine the service area dispute involved in this appeal. *Compare* NMSA 1978, §§ 72–1–1 through 72–1–12 (2005) (water rights in general), *and* NMSA 1978, §§ 72–2–1 through 72–2–18 (2003) (setting out the rules governing the duties of the state engineer), *with* § 62–9–1 (authorizing the PRC to resolve disputes between competing water utilities or MDWCAs). In light of the language of Section 62–9–1, we conclude that the State Engineer's ruling regarding water rights did not preclude the PRC's order under Section 62–9–1.

### C. Service to Sandhill Center

{25} Doña Ana also argues that the PRC erred in not adopting the Hearing Examiner's recommendation that either Moongate or Doña Ana could offer service to Sandhill Center. Doña Ana argues that Moongate's own experts conceded that service to a portion of Sandhill Center will not interfere with its system. Because there would be no interference, Doña Ana argues that the PRC's order was not supported by substantial evidence.

{26} Moongate offered testimony that it is prepared to offer service to Sandhill Center and is the only entity with facilities at elevations high enough to provide service to all of Sandhill Center within a reasonable time. In response, the PRC notes that Sandhill is within one-half mile of Moongate's facilities. The PRC does not require utilities to seek approval of new construction within contiguous territory and regards this territory as a part of the utility's service or system. Contiguous territory is generally within one-half mile of the utility's existing facilities and lines.

{27} We are not persuaded that the PRC erred in not adopting a portion of the Hearing Examiner's recommendation. As an initial matter, we note that the PRC is granted "general and exclusive power and jurisdiction to regulate and supervise every public utility in respect to its rates and service regulations and in respect to its securities." NMSA 1978, § 62–6–4(A) (2003). Our review of a final order by the PRC is not altered when the PRC's order is contrary to the recommendations of its hearing examiner or staff.

*See PNM Elec. Servs. v. N.M. Pub. Util. Comm'n,* 1998–NMSC–017, ¶¶ 5, 23–25, 125 N.M. 302, 961 P.2d 147 (reviewing the PRC's final order rejecting an application that the hearing examiner recommended the PRC accept). Our review might be altered if credibility of witnesses had been contested. *See Bd. of Educ. of the Melrose Mun. Schs. v. N.M. State Bd. of Educ.,* 106 N.M. 129, 130, 740 P.2d 123, 125 (Ct.App.1987) (recognizing that an agency may not arrive at a conclusion contrary to hearing examiner where credibility is at issue without reviewing the entire record). In this case, however, both the Hearing Examiner and the PRC based their decisions on reports and opinions submitted by experts whose credibility is based on their credentials and the strength of their analyses, rather than their demeanor as witnesses.

{28} We have already recognized that the PRC has the authority to interpret Section 62–9–1 broadly and the entry of a water service provider in an area may interfere in the service or system of another even if there is no risk of immediate impact on the physical system of the utility. In order to carry out its planning and coordination responsibilities, the PRC appears to have found that any construction by Doña Ana within one-half mile of Moongate's facilities will constitute interference. We are not persuaded that this is an incorrect application of the Section 62–9–1. Furthermore, the PRC has not mechanically or arbitrarily applied its half mile presumption. The PRC considered the likely ability of each entity to offer service to Sandhill Center, and its conclusion that Moongate was better prepared to offer service was supported by substantial evidence. The PRC also considered the long term effect of leaving an area open to receive service from multiple providers and determined that this would likely lead to future duplication and confusion. This was a proper factor for the PRC to consider, and provides additional support for its decision.

{29} There is evidence in the record that Moongate has facilities within one-half mile of Sandhill Center, is prepared to offer service in the area, has made previous investments in the area, and is the only entity with existing facilities capable of serving the en-

tire Sandhill Center. Granting exclusive service to Moongate in this area will avoid future confusion and disputes. We therefore conclude that the PRC's decision regarding Sandhill Center was supported by substantial evidence and is neither arbitrary nor capricious.

**D. PRC Jurisdiction to Rule on Doña Ana's Future Right to Serve Disputed Area**

{30} Doña Ana has argued that the PRC has no jurisdiction to issue a general statement regarding the future right of Doña Ana to serve customers in the disputed area. It appears to us that this statement flows naturally from the PRC's other findings in this case. Although the PRC has only limited jurisdiction over Doña Ana, it determined that any service in the disputed area by Doña Ana would constitute unreasonable interference with Moongate's service or system. The practical result of that conclusion is that Doña Ana will not have the right to serve the disputed area unless there is some significant change in water service. We therefore hold that this declaration was not outside the scope of the PRC's jurisdiction under Section 62–9–1.

**E. Construction of the East Mesa Project to Serve West of I–25.**

{31} Doña Ana argues separately that the PRC erred in preventing the construction of the East Mesa Project to serve its existing customers west of I–25. Doña Ana argues that the PRC did not specifically find that the construction of the project would interfere unreasonably with Moongate's service or system. The PRC only found that the use of the project facilities to serve customers in the disputed area would interfere unreasonably with Moongate's service or system. In the absence of such a finding, Doña Ana argues, the PRC did not have jurisdiction to prevent the construction.

{32} Although the PRC did not specifically find that the construction of the East Mesa Project would interfere with Moon-

gate's service or system, such a finding is implicit in the PRC's order. The record supports this finding. Even if the proposed tanks and lines were only used to serve customers west of I–25, Doña Ana's and Moongate's pipes would run parallel for some three miles, making leak detection and repair difficult. This is evidence of both interference and duplication, and we conclude that it is sufficient to support the PRC's conclusion that any construction would result in unreasonable interference with Moongate's service or system.

{33} Finally, we recognize that the prospect of federal preemption may have influenced the PRC's decision. The PRC may have fashioned its order to address the federal preemption that could result if Doña Ana were allowed to construct any facilities in the disputed area. *See* 7 U.S.C. § 1926(b) (2000) (protecting the service area of federal indebted water providers who have made service available to an area). Although it appears that Doña Ana has not yet "made available" (service) to the disputed area,[3] the East Mesa Project may make such service available. If the area were then a part of Doña Ana's protected service area, Moongate would not be permitted to serve new customers in the area, and the PRC's ability to coordinate service could be limited. Seeking to address this concern, the PRC's order included the suggestion that Doña Ana could reapply for permission to construct its tanks after obtaining a binding waiver of its federal rights in the area. Doña Ana argues that the PRC did not have the authority to condition its right to build the East Mesa Project on its waiving rights as a federally protected entity. We believe the PRC did have such authority as a matter of state law. Whether § 1926(b) limits or preempts the PRC's consideration of these federal rights is a question of federal law.

{34} The Tenth Circuit provided a partial answer to this question when it held that Doña Ana had not established that it currently had a § 1926(b) "right to serve future customers in the [d]isputed [a]rea." *Moon-*

---

3. Doña Ana is currently serving one customer in the disputed area, an RV storage tank on Del Ray Boulevard. Doña Ana's current facilities are not suited to provide service to most of the disputed area, because of its higher elevation.

gate Water Co. v. Doña Ana Mut. Domestic Water Consumers Ass'n, 420 F.3d 1082, 1088 (10th Cir.2005). The Tenth Circuit also held, based on the PRC order now under review, that "[u]nder state law Doña Ana is restricted from extending service to the [d]isputed [a]rea, so it will have no occasion to invoke any right under [§ 1926(b) ]." Id. at 1089. The Tenth Circuit stated that although "a state or local government may not act 'to take away from an indebted rural water association any territory for which the association is entitled to invoke the protection of § 1926(b),'" id. at 1090 (quoting Pittsburg County Rural Water Dist. No. 7 v. City of McAlester, 358 F.3d 694, 716 (10th Cir.2004) (emphasis omitted)), "Doña Ana has no vested § 1926(b) protection in the [d]isputed [a]rea." Id. The Tenth Circuit concluded that "the PRC Order is not preempted by § 1926(b) with respect to the [d]isputed [a]rea." Id. The parties have not asked us to re-examine this holding.

{35} To the extent that the Tenth Circuit left this matter unresolved, we conclude that our own review would be premature. We do not know at this time whether the PRC will, in fact, approve construction after Doña Ana obtains a federal waiver. Only after this approval will it be clear whether the basis of the PRC's decisions was Doña Ana's status as a federally protected water provider under § 1926(b). It is not clear whether this protected status is a sound or permissible basis for PRC decision making. Under state law this appears to be clearly relevant to the PRC's planning to avoid waste and duplication of water services. Federal law, however, may not permit this consideration. We leave this for a future court to determine, when the question is properly presented.

## III. Conclusion

{36} After reviewing the submissions of the parties and the record, we conclude that the PRC employed a reasonable standard to determine the scope of Moongate's protection under Section 62–9–1, the PRC's order was supported by substantial evidence, and that the order was within the scope of the PRC's

authority and jurisdiction. We therefore affirm.

{37} **IT IS SO ORDERED.**

WE CONCUR: RICHARD C. BOSSON, Chief Justice, PATRICIO M. SERNA, PETRA JIMENEZ MAES, and EDWARD L. CHÁVEZ, Justices.