The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

Opinion Number:

Filing Date: May 11, 2026

**NO. S-1-SC-40636**

**CITY OF LAS CRUCES,**

     Appellant,

v.

**NEW MEXICO PUBLIC REGULATION COMMISSION,**

     Appellee,

and

**EL PASO ELECTRIC COMPANY,**

     Intervenor-Appellee.

**In the Matter of the Application of El Paso Electric Company for a Variance from the Fuel and Purchased Power Cost Adjustment Clause Methodology, New Mexico Public Regulation Commission Case No. 21-00064-UT**

**APPEAL FROM THE NEW MEXICO PUBLIC REGULATION COMMISSION**

City of Las Cruces
Bradley Douglas, City Attorney
Las Cruces, NM

Stevens Law, LLC
Anastasia S. Stevens
Santa Fe, NM

for Appellant

Erin E. Lecocq, Appellate Specialist
Santa Fe, NM

for Appellee

El Paso Electric Co.
Nancy B. Burns
Santa Fe, NM

Spencer Fane, LLP
Jeffrey J. Wechsler
Kari E. Olson
Joseph M. Dworak
Santa Fe, NM

for Intervenor-Appellee El Paso Electric Co.

**OPINION**

**THOMSON, Justice.**

{1}     The public utility rate dispute at issue stems from the snow, ice, and severely cold temperatures brought by Winter Storm Uri, whose Arctic air gripped New Mexico for seven consecutive days in February 2021. Intervenor-Appellee El Paso Electric Company (EPE) relied, in in part, upon Palo Verde Nuclear Generating Station Unit 3 (PV3, PVGS Unit 3, or PVNGS Unit 3) to successfully provide electric energy and capacity to its New Mexico customers without interruption throughout the storm period. The rate dispute in this case centers on the propriety of EPE's use of a so-called proxy price formula to calculate the increase in consumer energy costs attributable to EPE's use of PV3. As a result of the storm, "natural gas prices skyrocket[ed] due to supply constraints" in New Mexico and other states impacted by the storm. *See, e.g.*, *Holcim U.S. Inc. v. Colo. Pub. Utils. Comm'n*, 2025 CO 1, ¶ 6, 562 P.3d 55 ("The interplay of the extreme cold, freeze-offs of natural gas production, and high customer demand for natural gas greatly impacted natural gas prices during th[e reign of Winter Storm Uri]," causing gas prices to "spik[e]."); *Evergy Mo. W. Inc. v. Off. of Pub. Couns.*, 676 S.W.3d 438, 442 (Mo. Ct. App. 2023) ("The spike in natural gas prices [caused by Winter Storm Uri] resulted in record high real-time electricity prices [in Missouri].").

{2}     The outcome of this appeal hinges on the proper interpretation and application of a number of prior rate-related orders issued by the New Mexico Public Regulation Commission (the Commission or NMPRC) in separate administrative proceedings involving EPE and addressing similar PV3 proxy price issues. As a threshold matter, however, this Court has not previously established the level of deference, if any, we extend to the Commission's interpretation of its own prior orders. This opinion resolves this issue of first impression in favor of the Commission by adopting the "high level of deference" generally accorded an "agency's interpretation of its own orders." 73A C.J.S. *Public Administrative Law & Procedure* § 343 (2014). Applying the standard, we uphold the results of the full and fair administrative proceedings held by the Commission and affirm the Commission's final orders.

{3}     We begin by summarizing the procedural backdrop of the Commission's rulings and explaining the nature of the PV3 facility and the proxy price methodology EPE employed in calculating its storm-related, temporary rate increase.

## I.     BACKGROUND

### A.     Procedural Backdrop

{4}     The underlying administrative proceeding (*El Paso Elec. Co.*, No. 21-00064-UT) commenced when EPE moved for a variance relating to its approved Fuel and

Purchased Power Cost Adjustment Clause (FPPCAC) as it applied to the cost of PV3-generated energy. Specifically, EPE sought authorization to employ an amortized rate to collect over a twelve-month period the extraordinary, incremental electricity cost increases from Winter Storm Uri. The rate was designed to lessen what the Colorado Supreme Court described in parallel circumstances as "the 'rate shock' that customers would have experienced had [the utility] sought to recover the extraordinary costs over [a] shorter period of time." *Holcim U.S. Inc.*, 2025 CO 1, ¶ 12. The propriety of the amortization relief EPE sought on behalf of its customers has never been challenged. Instead, several intervenors—spearheaded by Appellant City of Las Cruces (City)—focused that administrative proceeding on various legal challenges to EPE's claimed entitlement to collect *any* increased costs for PV3-generated energy attributable to Winter Storm Uri.

**B.     The Nature and Status of the PV3 Facility and the Proxy Price Methodology and Its Workings**

{5}     PV3 is part of a sprawling, Arizona-based nuclear electric generating station. Explaining PV3's history and status, EPE's Vice President of Regulatory Affairs testified in the proceedings that:

> PVGS Unit 3 became operational in 1988 but was never included in non-fuel base rates in New Mexico. In 1998, as part of a comprehensive stipulation adopted by the Commission in Case No. 2722, the Commission decertified and deregulated PVGS Unit 3 but approved the voluntary use of PVGS Unit 3 capacity and energy for EPE's New

Mexico customers at the lowest equivalent market price for capacity and energy available to EPE. Notwithstanding that PVGS Unit 3 is a decertified and deregulated plant in the New Mexico jurisdiction, EPE has historically relied on the NMPRC's approval to voluntarily use PVGS Unit 3 capacity and energy to serve its New Mexico load when available, and has agreed to sell power from PVGS Unit 3 to its customers in New Mexico using the market proxy price established by the Commission.

When asked to describe the benefits provided by EPE's use of electricity generated at PVGS Unit 3, EPE's Vice President emphasized the utility's view that "PVGS Unit 3 is highly reliable" because, among other attributes, the facility "has very low and stable fuel costs that have helped insulate EPE's customers from volatile purchased power and natural gas prices." EPE's Vice President also stated that "as a carbon-free resource, PVGS Unit 3 is consistent with New Mexico's carbon-free objectives."

{6}     As the use of the word *proxy* suggests, the term proxy price denotes a default pricing mechanism not dependent on the actual cost of generating power, in this case electrical power produced in a nuclear power plant. *See generally* Final Order Conditionally Approving and Clarifying Unopposed Stipulation (Final Order), *El Paso Elec. Co.*, No. 09-00171-UT, at 19-20 (N.M. Pub. Regul. Comm'n Dec. 10,

2009) (Doc. 1076824).[1] The Commission-approved proxy price rate for PV3-generated energy was calculated on the basis of natural gas market index prices, as is set forth in a comprehensive stipulated order (the Credit Suisse Agreement) that resolved an earlier NMPRC proceeding. *Id.*

{7} The provisions of the stipulated agreement settling the above-cited 2009 rate case read as follows:

- Capacity component: On a monthly basis, EPE will include capacity costs for PVNGS Unit 3 in purchased power at the rate of $9.25 per kilowatt ("kW") times 211 MW of capacity at PVNGS Unit 3.
- Energy component: On a monthly basis[,] the energy costs for PVNGS Unit 3 will be calculated by multiplying the megawatt-hours ("MWh") of energy generated by PVNGS Unit 3 times the sum of: [(1)] the Permian Basin daily index price as reported in Platt's Gas Daily's Price Survey for the corresponding day of delivery under the heading "Permian Basin Area: El Paso, Permian Basin, Midpoint" times a 7.6 MMBtu per MWh heat rate and [(2)] $3.50 per MWh for non-fuel operation and maintenance expense.
- The amounts computed for capacity and energy on a Company basis will be allocated to New Mexico based upon the monthly energy allocator used to allocate fuel and purchased power costs to the New Mexico jurisdiction.

*Id.* at 20. The use of such proxy pricing mechanisms is by no means unfamiliar in electricity generation rate regimes. *See, e.g.*, *Transmission Agency of N. Cal. v. FERC*, 628 F.3d 538, 554 (D.C. Cir. 2010) (recognizing that proxy prices that

---

[1]NMPRC pleadings are published for viewing at https://www.prc.nm.gov/case-lookup-e-docket/ (last visited May 6, 2026).

"deviate from the market price . . . can be just and reasonable, if supported by record evidence"); *Pub. Serv. Co. of N.H. v. Patch*, 167 F.3d 15, 19 (1st Cir. 1998) (addressing a state utility commission's "use of a retail market proxy price . . . [that] allow[ed] an increment to the distribution charge over and above actual distribution cost . . . [in order] to end the existing regime in which the agency set retail rates for electric power in New Hampshire based on cost").

## II.    DISCUSSION

### A.    Standard of Review

{8}    As the party challenging the Commission's final orders, the City "has the burden of establishing that the order[s are] arbitrary and capricious, not supported by substantial evidence, outside the scope of the agency's authority, or otherwise inconsistent with law." *N.M. Indus. Energy Consumers v. N.M. Pub. Regul. Comm'n*, 2019-NMSC-015, ¶ 8, 450 P.3d 393 (internal quotation marks and citation omitted); *see also* NMSA 1978, § 62-11-4 (1965) ("The burden shall be on the party appealing [a Commission order] to show that the order appealed from is unreasonable, or unlawful."). In reviewing the Commission's final orders, our first task is to "consider whether the [orders] present[] a question of fact, a question of law, or a combination of the two." *Pub. Serv. Co. of N.M. v. N.M. Pub. Regul. Comm'n*, 2019-NMSC-012, ¶ 13, 444 P.3d 460. The principal issue raised by the

City in this appeal—whether the Commission appropriately used the PV3 proxy price formula to calculate the incremental cost increases attributable to Winter Storm Uri—implicates questions of law. The City's fallback issues—whether the Commission's final orders were arbitrary and capricious and not supported by substantial evidence—are primarily fact-based. *See N.M. Atty. Gen. v. N.M. Pub. Regul. Comm'n*, 2013-NMSC-042, ¶ 10, 309 P.3d 89 ("A ruling by an administrative agency is arbitrary and capricious if it is unreasonable or without a rational basis, *when viewed in light of the whole record*." (emphasis added) (internal quotation marks and citation omitted)).

{9} As concerns questions of law, this Court "will reverse the agency's interpretation of a law if it is unreasonable or unlawful" and "will confer a heightened degree of deference to legal questions that implicate special agency expertise or the determination of fundamental policies within the scope of the agency's statutory function." *Pub. Serv. Co. of N.M.*, 2019-NMSC-012, ¶ 15 (internal quotation marks and citation omitted). We have long recognized "the broad authority of the Commission in setting utility rates." *N.M. Indus. Energy Consumers v. N.M. Pub. Regul. Comm'n*, 2007-NMSC-053, ¶ 30, 142 N.M. 533, 168 P.3d 105 (internal quotation marks and citation omitted). We extend particular deference to the Commission's "considerable discretion in determining the justness and

reasonableness of utility rates," even going so far as to say that "the Commission is statutorily and constitutionally free to use any ratemaking formula it chooses." *Att'y Gen. of N.M. v. N.M. Pub. Serv. Comm'n*, 1984-NMSC-081, ¶¶ 12, 15, 101 N.M. 549, 685 P.2d 957 (internal quotation marks and citations omitted).

{10} When it comes to questions of fact, this Court has held that "an agency's action is arbitrary and capricious if it provides no rational connection between the facts found and the choices made, or entirely omits consideration of relevant factors or important aspects of the problem at hand." *N.M. Indus. Energy Consumers*, 2019-NMSC-015, ¶ 8 (brackets, internal quotation marks, and citation omitted). We have also held that the substantial evidence standard is met when an agency decision or order "is supported by evidence that is credible in light of the whole record and that is sufficient for a reasonable mind to accept as adequate to support the conclusion reached by the agency." *Id.* (internal quotation marks and citation omitted).

**B.     The Need to Expound on the Standard of Review Governing an Agency's Interpretation of Its Own Orders**

{11} This Court has not previously established the proper standard of review regarding the Commission's interpretation of its own orders, a question the Commission itself agrees remains unresolved. Given the decidedly policy-centric nature of the standard-of-review question now before us and the paucity of New Mexico caselaw on the subject, we look for guidance from other jurisdictions as well

as "general principles of law." *See Morris v. Giant Four Corners, Inc.*, 2021-NMSC-028, ¶ 28, 498 P.3d 238.

{12}   Courts elsewhere, particularly federal courts, generally favor a highly deferential approach when reviewing an agency's interpretation of its own prior orders. *See, e.g.*, *Udall v. Tallman*, 380 U.S. 1, 4 (1965) (recognizing that courts "must . . . respect" an agency's interpretation of its own orders so long as it represents "a reasonable interpretation," even where the "interpretation may not be the only one permitted by the language of the orders"), *superseded by statute on other grounds as stated in W. Energy All. v. Salazar*, 709 F.3d 1040, 1044 (10th Cir. 2013); *City of Angels Broad., Inc. v. FCC*, 745 F.2d 656, 661 (D.C. Cir. 1984) ("Our review . . . of the Commission's construction of its own prior order is narrow: we may not overturn it unless there are compelling indications that it is wrong."). For purposes of this case, the Tenth Circuit Court of Appeals provides the most useful endorsement of the high-deference approach analyzed through a three-factor inquiry that includes "examining the entire context of the original order; *looking to subsequent agency conduct, especially further orders*; and . . . examining the agency's litigation position." *S. Utah Wilderness All. v. Off. of Surface Mining Reclamation & Enf't*, 620 F.3d 1227, 1239 (10th Cir. 2010) (emphasis added); *see also* 73A C.J.S. *Public Administrative Law and Procedure* § 343 (2014) ("In giving

substantial deference to an agency's interpretation of its own order, courts evaluate an agency's interpretation by examining the entire context of the original order; *looking to subsequent agency conduct, especially further orders*." (emphasis added)).

{13}    We now adopt the same highly deferential standard in reviewing a New Mexico agency's reading of its own orders. This approach is consistent with this Court's practice of "tread[ing] lightly in reviewing [the Commission's] construction of an unclear or ambiguous statute where, as here, the issue presented implicates policy choices," in which case we "will overturn the administrative construction of statutes by appropriate agencies *only if they are clearly incorrect*." *El Paso Elec. Co. v. N.M. Pub. Regul. Comm'n*, 2025-NMSC-009, ¶ 14, 563 P.3d 920 (internal quotation marks and citation omitted); *see also U.S. W. Commc'ns, Inc. v. N.M. State Corp. Comm'n*, 1997-NMSC-031, ¶ 8, 123 N.M. 554, 943 P.2d 1007 (recognizing in a different context that orders issued by a state commission "have the same force as statutes enacted by the [L]egislature").

{14}    This deferential review standard strongly supports affirmance of the Commission's final orders presently on appeal.

**C.    The City's Misguided Reading of the Commission's Final Order in *El Paso Elec. Co.*, No. 09-00171-UT**

{15}    The City contends that limiting language in the Credit Suisse Agreement (*see*

*El Paso Elec. Co.*, No. 09-00171-UT)—whose terms restricted the application of the proxy price provisions set out therein to "this Stipulation only"[2]—precludes the Commission's continued reliance on the proxy price formula to determine the proper rate for energy produced at the PV3 facility. The City's argument is best characterized as a misplaced freeze-frame analysis. The Commission's final order in the pivotal 2009 rate case, establishing the proxy price formula at issue, went on to serve as the cited justification for the Commission's continued use of the same Credit Suisse proxy price formula to measure the cost of EPE's PV3-produced energy in multiple subsequent administrative cases.

{16}    To illustrate this point, we focus our attention primarily on the final orders issued by the Commission in two such subsequent administrative cases. In the first of those final orders, the Commission approved EPE's 2013 application "to continue the current proxy price for PVNGS Unit 3 firm capacity and energy" that previously

---

[2]The City makes exclusive reference to the "this Stipulation only" language in the underlying 2009 settlement stipulation agreed to by the parties in *El Paso Elec. Co.*, No. 09-00171-UT, without recognizing the controlling terms of the Commission's subsequent final order in that case. The final order "conditionally-approv[ed] and clarif[ied]" the stipulation and, in doing so, more fully and specifically spoke of "EPE's agreement, *for the period of the Stipulation and until the Commission establishes new rates thereafter*, to voluntarily provide capacity and energy from deregulated and decertified PVNGS Unit 3 to New Mexico retail customers." Final Order, No. 09-00171-UT, Dec. 10, 2009, *supra*, at 13 (emphasis added).

had been authorized in the 2009 rate case, pricing that, as the Commission expressly found in addressing EPE's 2013 application, "continue[d] to be reasonable" during the relevant time period there involved. Final Order, *El Paso Elec. Co.*, No. 13-00380-UT, ¶ 12 (N.M. Pub. Regul. Comm'n Jan. 8, 2014) (Doc. 1122820) (concluding that, although the Credit Suisse Agreement entered into by the parties in the prior 2009 rate case had "terminated as of April 2010, the associated pricing [then] remain[ed] competitive based on current market pricing . . . [and] reflect[ed] the lowest equivalent market price of capacity and energy"). Plainly, the Commission's approval of the *2009* Credit Suisse proxy price formula in EPE's *2013* PV3-related rate case eclipses the City's notion that the Commission intended the 2009 use of the PV3 proxy pricing formula to serve as a stand-alone, one-off event.

{17}   Nor did the Commission's treatment of the PV3 proxy price-related issues raised by the City in yet another NMPRC proceeding in any way serve to advance the City's cause in the matter at hand. *See* Final Order Adopting Recommended Decision with Modifications (Final Order), *El Paso Elec. Co.*, No. 18-00006-UT (N.M. Pub. Regul. Comm'n Feb. 13, 2019) (Doc. 1175713). That is, the City's current position notwithstanding, the 2018 case—initiated by EPE's "Application for Continued Use of its Fuel and Purchase[] Power [Cost Adjustment] Clause . . . covering the period of calendar years 2015-2016"—did little more than maintain the

proxy price status quo. Recommended Decision, *El Paso Elec. Co.*, No. 18-00006-UT, at 1 (N.M. Pub. Regul. Comm'n Nov. 21, 2018) (Doc. 1174158). The Commission explained in its 2024 order denying the City's motion for rehearing that the February 2019 final order issued by the Commission in No. 18-00006-UT was the "relevant" agency order in place at the time of the Winter Storm Uri "crisis," and that order by its terms merely "confirmed the continuation of EPE's authorization to use PV3 energy and capacity at the proxy price." Order Denying Motion for Rehearing and Motion for Stay, *El Paso Elec. Co.*, No. 21-00064-UT, ¶ 26 (N.M. Pub. Regul. Comm'n Oct. 3, 2024) (Doc. 1235974). Indeed, far from altering New Mexico's proxy price mechanism, the final order issued by the Commission in the 2018 FPPCAC case deliberately left any changes in approach to the proxy pricing mechanism for another day. *See* Final Order, No. 18-00006-UT, Feb. 13, 2019, *supra*, ¶ 85. (noting the "important" nature of the "proxy pricing" issue raised by the City in connection with EPE's use of PV3 energy and "urg[ing EPE] and the parties to be prepared to present and review th[is] issue[] in EPE's next rate case").

{18}   Neither of the earlier NMPRC orders discussed herein, nor any other NMPRC order issued prior to Winter Storm Uri, expressly or impliedly foreclosed EPE's use of the PV3 proxy price formula the City now challenges. To the contrary, EPE has consistently relied on the PV3 proxy price formula for the better part of two decades,

as a hearing examiner assigned to the administrative proceedings in this case correctly recognized. Second Recommended Decision, *El Paso Elec. Co.*, No. 21-00064-UT, at 43 (N.M. Pub. Regul. Comm'n May 20, 2024) (Doc. 1233452). Use of the formula has been "reaffirmed and perpetuated" throughout the relevant time period, as the Commission further confirms in its briefing to this Court.[3]

**D.     The Commission's Application of the Proxy Price Formula to the Facts of This Case Was Not Arbitrary and Capricious or Unsupported by Substantial Evidence**

{19}     The City's claims that the Commission's final orders on appeal are arbitrary and capricious or unsupported by substantial evidence as a result of the agency's purported misapplication of the proxy price formula to the facts in this case are unpersuasive. The Commission's final orders established the requisite "rational connection between the facts found and the choices made" and were supported by

---

[3]The Commission's present briefing acknowledges its view that, as matters now stand, EPE can "no longer use PV3 as a[n energy] resource," a circumstance said to be attributable to EPE's insistence in its most recent general rate case, *El Paso Elec. Co.*, No. 20-00104-UT, that it is now entitled to "fully . . . recover its costs" consistent with its present "unwilling[ness] to go forward under the old [PV3 Credit Suisse A]greement." *See also* Order Adopting Recommended Decision with Modifications, *El Paso Elec. Co.*, No. 20-00104-UT, ¶ 34 (N.M. Pub. Regul. Comm'n June 23, 2021) (Doc. 1203549). Because all of this undisputedly transpired "after EPE's use of PV3 during Winter Storm Uri," there is no suggestion by any of the parties that EPE's recent change of heart has any bearing on the outcome of the case at hand. We thus have no occasion to address this recent development in resolving the present appeal.

substantial evidence. *N.M. Indus. Energy Consumers*, 2019-NMSC-015, ¶ 8 (internal quotation marks and citation omitted) ("[A] decision is supported by substantial evidence when it is supported by evidence that is credible in light of the whole record and that is sufficient for a reasonable mind to accept as adequate to support the conclusion reached by the agency" (internal quotation marks and citation omitted)).

{20} As articulated by the Commission itself during the course of the extensive administrative proceedings, the decisive question in resolving this matter was "whether PVNGS [Unit] 3 energy and capacity was the most cost-effective resource available to EPE when EPE chose to use it in response to [Winter Storm] Uri and the natural-gas crisis in February 2021." Order Adopting Recommended Decision with Modifications; Order Assigning Matter to Hearing Examiner for Further Proceedings, *El Paso Elec. Co.*, No. 21-00064-UT, at 15, ¶ A (N.M. Pub. Regul. Comm'n Dec. 28, 2022) (Doc. 1216995). In her comprehensive analysis of that and other related issues, the hearing officer ultimately determined that "EPE has provided credible evidence that using PV3 for capacity and energy was necessary and available to provide continuous uninterrupted service during . . . Winter [Storm Uri]" and that it was "manifestly reasonable" for EPE to have chosen "to use [PV3] in response to [Winter Storm] Uri and the natural-gas crisis in February 2021."

Second Recommended Decision, No. 21-00064-UT, May 20, 2024, *see supra*, at 37, 44.

{21} The Commission fully adopted the hearing officer's determination that PVNGS Unit 3 "was the most cost-effective resource available to EPE" in the face of Winter Storm Uri. Order Adopting Second Recommended Decision, *El Paso Elec. Co.*, No. 21-00064-UT, ¶ 10 (N.M. Pub. Regul. Comm'n Aug. 22, 2024) (Doc. 1235485). In doing so, the Commission pointed to record evidence showing that PVNGS Unit 3 "was the only resource available to EPE that could be relied upon to provide continuous, uninterrupted service" during the storm period, and relied as well on the persuasive logic of the hearing examiner's "own, evidence-based analysis of the actual cost effectiveness of the [PV3] resource." *Id.* ¶¶ 15, 19.

{22} There is no reasonable basis for this Court to reweigh the evidence or substitute our own judgment for that of the Commission on the factual matters at issue during the administrative proceedings. Nonetheless, brief comment is warranted on whether, as the City frames the issue, the Commission's final orders in the present case were arbitrary and capricious in that they approved EPE's

recovery of PV3 energy "for Every Hour of February 2021 at the Proxy Price" despite the finite, seven-day duration of Winter Storm Uri.[4]

{23}     The short answer is provided in the Commission's briefing to this Court: The monthly duration of the incremental rate increase approved by the Commission is consistent with—and, indeed, called for by—the very purpose and function of the proxy price formula itself. This is reflected in both the express terms of the Credit Suisse Agreement—which calculates both the capacity and energy components of the proxy price standard "[o]n a monthly basis"—as well as the administrative-hearing testimony of EPE witness Jennifer Borden, the utility's Director of Regulatory Accounting. Borden emphasized that "[e]*ach month* through the FPPCAC reporting process, EPE reprices the power from PVGS Unit 3 on a total

_____

[4]The Commission, for its part, frames the question as asking whether the agency "correctly calculated incremental costs using the proxy price," and characterizes that issue—without supporting analysis—as "a question of fact." Inasmuch as the City's contention centers on the manner or method by which the Commission applied the proxy price formula to obtain the proper incremental rate increase—as opposed to the pure amount of the rate increase itself—the Commission's unsupported position that any issue relating to the efficacy of its use of the proxy price necessarily presents "a question of fact" appears overly simplistic and flawed. *See generally Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 196 (2d Cir. 2003) (observing, in a breach of contract context, that "[a]lthough the amount of recoverable damages is a question of fact, the measure of damages upon which the factual computation is based is a question of law" (internal quotation marks and citation omitted)). Despite this procedural hurdle, we address the merits of the issue for purposes of completeness.

Company basis and then allocates a portion of the cost to its New Mexico jurisdiction retail customers"[5] (emphasis added).

## III.   CONCLUSION

{24}   We affirm the Commission's final orders in their entirety. In doing so, we conclude that the City did not meet its burden to prove that EPE improperly used PV3 energy at the long-recognized Credit Suisse proxy price or that the Commission's final orders awarding EPE recovery of the cost of PV3 energy as calculated under the proxy price method were not reasonable or rationally based on the record evidence.

{25}   **IT IS SO ORDERED.**

**DAVID K. THOMSON, Justice**

---

[5]We note that Borden's testimony also served to debunk the City's theorem that the $5.7 million incremental cost increase charged by EPE "reflects application of the proxy price to the PV3's energy production *for every day of February 2021*" (emphasis added). To the contrary, the witness made clear that EPE "exclude[d] from the PVGS Unit 3 price calculation . . . the days immediately before and after [Winter Storm Uri] when the market was obviously adjusting up in anticipation of [Uri] and adjusting back down to 'normal' prices after [Uri]."

**WE CONCUR:**

_____
**JULIE J. VARGAS, Chief Justice**

_____
**MICHAEL E. VIGIL, Justice**

_____
**C. SHANNON BACON, Justice**

_____
**BRIANA H. ZAMORA, Justice**